# In the United States Court of Federal Claims

No. 16-101C

(Filed Under Seal: April 20, 2016)
(Reissued: April 28, 2016)

| | |
|---|---|
| Q INTEGRATED COMPANIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>SAGE ACQUISITIONS, LLC,<br><br>Defendant-Intervenor. | Post-award bid protest; HUD asset-management contracts for three geographic areas; awards based upon a trade-off between past performance ratings and price; challenge to past performance ratings; adequacy and fairness of discussions with offerors within the competitive range; FAR § 15.306(d) |

James C. Fontana, Dempsey Fontana, PLLC, Tysons Corner, Virginia for plaintiff. With him on the briefs and at the hearing was Jeffry R. Cook, Dempsey Fontana, PLLC, Tysons Corner, Virginia.

Heidi L. Osterhout, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for defendant. With her on the briefs were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Douglas K. Mickle, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. With her at the hearing were Rosamond Xiang, Jonathan English, and Linda Fallowfield, United States Department of Housing and Urban Development, Washington, D.C.

W. Hartmann Young, Perkins Coie LLP, Washington, D.C. for defendant-intervenor. With Mr. Young on the briefs was Richard W. Oehler, Perkins Coie LLP, Seattle, Washington.

## OPINION AND ORDER[1]

---

[1]Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the United States Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and provide proposed redactions of any

LETTOW, Judge.

This post-award bid protest arises from a solicitation by the United States Department of Housing and Urban Development ("HUD" or "government") for contracts in twelve geographic areas to market and sell single-family homes acquired by HUD after the owners defaulted on mortgages supported by the Federal Housing Administration. Most, but not all, of those contracts were reserved for small businesses. On September 30, 2015, the government awarded contracts for each of these twelve areas to various offerors, and Sage Acquisitions, LLC ("Sage") received a number of those contracts. Another offeror, Q Integrated Companies, LLC ("Q Integrated"), protested three of the awards to Sage at the Government Accountability Office ("GAO"). GAO dismissed Q Integrated's protest because a case was filed in this court arising out of the same solicitation but involving a different area award, a different protesting offeror, and a different awardee. Q Integrated then filed its complaint in this court, and Sage was granted leave to intervene to defend its awards. At issue are HUD's awards of contracts to Sage for Areas 7A, 1D, and 5P.

Q Integrated seeks a permanent injunction of the awards to Sage, asserting that HUD irrationally evaluated Q Integrated's and Sage's past performance information and that HUD's discussions with Q Integrated were insufficient under the terms of the solicitation and relevant regulations. Pending before the court are the parties' cross-motions for judgment on the administrative record. For the reasons discussed in this opinion, the court has concluded that Q Integrated's motion for judgment on the administrative record should be granted in part but denied in part, and that the government's and defendant-intervenor's cross-motions should be granted in part and denied in part.[2]

---

confidential or proprietary information. The resulting redactions are shown by asterisks enclosed by brackets, *i.e.*, "[***]".

[2]Five other bid protests stemming from the same HUD solicitation have been filed in this court. Each of these cases has raised distinctly different issues. First, Precision Asset Management Corporation ("Precision") filed a protest on December 10, 2015, challenging HUD's award of the asset management contract for Area 5A to KM Minemier & Associates and asserting that its overall past performance rating should have been higher. *Precision Asset Mgmt. Corp. v. United States*, 125 Fed. Cl. 228, 229 (2016). Judge Merow granted the government's motion to dismiss on February 26, 2016, finding that Precision lacked standing to bring the protest. *Id.* at 233-34. Second, on January 21, 2016, Prescient, Inc. ("Prescient") protested HUD's award of the contract for Area 2D to Matt Martin Real Estate Management, LLC, contesting the government's determination that Prescient's proposal was technically unacceptable. *Prescient, Inc. v. United States*, __ Fed. Cl. __, __, No. 16-109C, 2016 WL 1367409, at *1 (Mar. 29, 2016). Judge Kaplan denied this protest. *Id.* Third, on February 24, 2016, Precision filed a further protest, this time challenging HUD's award of the contract for Area 3A to Alpine-First Preston JV II LLC. *See Precision Asset Mgmt. Corp. v. United States*, No. 16-261C (Feb. 24, 2016). The administrative record of that procurement has been filed, *see Precision Asset Mgmt. Corp.*, No. 16-261C, ECF No. 20, an application for temporary injunctive relief has been briefed, and a motion has been submitted to consolidate a later-filed protest

2

## FACTS[3]

### A.  *The HUD Real Estate Owned Program*

Since 1999, HUD has contracted with private entities to manage and market its inventory of single-family homes obtained as a result of mortgage defaults.  AR 1-23.[4]  For the first ten years of this program, HUD "contracted with single entities to provide all of the administrative, program support, management and marketing services throughout the United States [and its territories]."  AR 1-23.  In 2009, HUD separated the contracts for the marketing and sales function (Asset Management) from the property management function (Field Service Management), and "introduced multiple award competition at the task order level."  AR 1-23.  These contracts are now divided geographically across four regional Homeownership Centers, headquartered in Atlanta, Philadelphia, Denver, and Santa Ana (California).  AR 2-224.  Each Homeownership Center contains several smaller "areas" consisting of a state or group of states, designated by a number followed by the first letter of the regional headquarters.  AR 2-224.  For example, Area 5A is managed by the Atlanta Homeownership Center and covers North Carolina and South Carolina.  AR 2-224.

---

respecting the same contract, see Unopposed Mot. to Consolidate Case No. 16-442 with This Case, *id.*, ECF No. 30.  Fourth, REO Solution, LLC ("REO"), filed a protest on March 4, 2016, challenging HUD's award of a contract for Area 1P to Sage following disqualification of IEI-Cityside, JV.  *See* Mot. for Prelim. Inj., *REO Solution, LLC v. United States*, No. 16-296C (Fed. Cl. Mar. 4, 2016), ECF No. 6.  Judge Bruggink denied as moot REO's application for a temporary restraining order, Order of Mar. 9, 2016, *REO Solution*, No. 16-296C, ECF No. 18, and subsequently denied REO's motion for a preliminary injunction, Order of Mar. 30, 2016, *REO Solution*, No. 16-296C, ECF No. 29.  The court has not yet issued a decision on the merits of REO's protest.  Fifth, on April 7, 2016, Q Integrated filed a protest of HUD's award of the contract for Area 3A to Alpine-First Preston JV II LLC.  *See Q Integrated Companies, LLC v. United States*, No. 16-442C (Apr. 7, 2016).

[3]The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement filed pursuant to RCFC 52.1(a), *see Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (specifying that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court"), as well as from the parties' evidentiary submissions related to prejudice and equitable relief, *see Holloway & Co. v. United States*, 87 Fed. Cl. 381, 391 n.12 (2009) ("It is the responsibility of th[e] court, not the administrative agency [conducting the procurement], to provide for factual proceedings directed toward, and to find facts relevant to, irreparability of harms or prejudice to any party or to the public interest through grant or denial of injunctive [or declaratory] relief." (quoting *PGBA, LLC v. United States*, 60 Fed. Cl. 567, 568 n.1, *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004))).

[4]Citations to the administrative record refer to the record filed on February 4, 2016, ECF No. 30, and corrected on March 16, 2016, ECF No. 42.  The record is paginated sequentially and is also divided into tabs.  In citing to the administrative record, the court will first designate the tab, followed by page number, *e.g.*, AR 1–23 refers to page 23, which is located in tab 1 of the record.

HUD awarded a total of 23 Asset Management contracts in May 2010, each of which had a 12-month base period and four 12-month option periods that, if exercised, would provide for these services through May 2015.  AR 1-23 to -24.  By May 2013, however, HUD recognized that twelve of these Asset Management contracts were "realizing the available ceilings . . . much sooner than anticipated," in part because of the nationwide foreclosure crisis.  AR 1-24.  Accordingly, HUD sought to award new Asset Management contracts for these twelve areas by September 30, 2014.  AR 1-3.  The anticipated award date for the new contracts was later changed to September 30, 2015.  *See* AR 2-487 (amendment to the solicitation stating the period of performance would begin on September 30, 2015).

The twelve new award areas were 3A (Illinois), 4A (Indiana and Kentucky), 5A (North Carolina and South Carolina), 6A (Alabama, Mississippi, and Tennessee), 7A (Georgia), 8A (Florida, Puerto Rico, and the U.S. Virgin Islands), 1D (Utah, Colorado, New Mexico, and Northern Texas), 2D (Kansas, Oklahoma, Arkansas, Louisiana, Missouri, and Southern Texas), 1P (Michigan), 3P (Maine, Vermont, New York, New Hampshire, Rhode Island, New Jersey, Massachusetts, and Connecticut), 4P (Ohio), and 5P (Pennsylvania, West Virginia, Virginia, Delaware, Maryland, and the District of Columbia).  AR 1-3.  Based on the results of the government's market research conducted in mid-2013, Areas 3A, 6A, 7A, 8A, 1D, 1P, 3P, 4P, and 5P were to be 100 percent small business set-aside contracts, Areas 4A and 5A were to be woman-owned small business set-aside contracts, and Area 2D was to be an unrestricted competition.  AR 1-3, -28 to -31.[5]

B.  *Solicitation for the New Asset Management Contracts*

1.  *Contract specifications.*

On July 25, 2014, HUD issued a request for proposals ("RFP") for the new Asset Management contracts (solicitation number DU204SA-13-R-0005).  AR Tab 2.[6]  The RFP stated that the contracts would be single-award indefinite delivery/indefinite quantity contracts, as defined by the FAR, and fulfilled through task orders.  AR 2-508.  The contracts were to have a base period from the award date until May 31, 2016, which HUD estimated would be eight months based on an anticipated award date of September 30, 2015, plus four one-year option periods.  AR 2-508.  The pricing of the contracts would be based on a proposed marketing fee the contractor would receive for each property sold, stated as a percentage of the offer price of the property.  AR 2-509 to -10.  This fee percentage varied based on certain factors, including whether the property was sold within 90 days of assignment, whether the sale price was at least 95 percent of the initial listing price, and whether the buyer was a participant in the Asset

---

[5]The eligible businesses were defined under the North American Industry Classification System code 531210, Offices of Real Estate Agents and Brokers, with a small business size standard of $7 million in average annual revenue.  AR 2-47.

[6]Between July 2014 and September 2015, HUD made a total of eleven amendments to the RFP.  The descriptions of and citations to the solicitation are based on the final conformed solicitation issued on September 4, 2015, AR 2-507 to -700.

Control Area program (*i.e.*, the buyer was a local government or non-profit developer qualified by HUD to purchase foreclosed homes at a reduced price). AR 2-509 to -10; *see also* AR 2-561 (describing the Asset Control Area program). Contractors would also be reimbursed for actual costs incurred for appraisal fees, record retention, post-closing complaints, negative sales proceeds, and inspections directed by the government technical representative. AR 2-510.

Each contract would include a start-up phase of 30 days from the contract effective date, during which time the contractor would undertake various tasks to be "ready to assume contract responsibilities." AR 2-580 to -81. These tasks included establishing an adequate physical infrastructure, retaining necessary staff and subcontractor support, developing information technology resources, submitting the required security clearance forms for access to HUD electronic and other systems, meeting with HUD staff, training the workforce, obtaining the required "licenses, permits, bonds and legal permissions . . . within the awarded geographic area," and implementing quality control programs. AR 2-580. The start-up phase would be followed by a ramp-up phase extending until the 106th day of the contract in which HUD would begin transferring unsold inventory and pending contracts under the prior Asset Management contract to the new contractor. AR 2-583 to -84.

2. *Proposal requirements.*

The RFP instructed each offeror to submit a technical proposal that contained a workflow chart and organizational chart with accompanying narratives describing how the proposal would meet the government's requirements. AR 2-670 to -72. The technical proposals were also to include a "condensed [m]arketing [p]lan" addressing broker assignments, responsibilities, and training, as well as the offerors' plans to conduct market analysis and property valuation, including considerations for "aged" and hard-to-sell properties. AR 2-672 to -73.

Offerors were also instructed to submit a past/present performance proposal, including "client list information" for the offeror and any joint venture partner, plus any subcontractors, vendors, or suppliers "that may perform major or critical aspects" of the contract, defined as "performing more than [25] percent of the [o]fferor's proposed pricing [for a contract area]." AR 2-673; *see also* AR 2-272 (clarification of the "major or critical aspects" definition). Additionally, HUD would evaluate past/present performance questionnaires returned by points of contact from the offerors' prior contracts. AR 2-677. The RFP stated that HUD would evaluate only three past performance references for each offeror, "inclusive of any submissions on behalf of subcontractors." AR 2-673. Each offeror was to submit summaries of "its three most recent and relevant contracts," including "the nature of work, criticality of work, and percentage of overall work." AR 2-673.

Finally, the RFP instructed offerors to submit a business proposal with pricing data for all marketing fees and reimbursable items outlined in the RFP. AR 2-678 to -79. Offerors were also advised that the successful offeror would be required to obtain a line of credit of at least $500,000 per contract area within ten days of notification of selection, and therefore offerors should begin the process of securing this credit facility as soon as possible. AR 2-679.

3.  *Evaluation process.*

The evaluation criteria section of the RFP (Section M) stated that HUD would conduct a best-value source selection based on a performance-price trade-off, in which past/present performance would be considered "approximately equal to" price.  AR 2-680.  HUD would first evaluate the offerors' technical proposals for acceptability on a "pass/fail basis."  AR 2-680 to -81.  All technically acceptable proposals would then be evaluated for "price reasonableness and balanced pricing."  AR 2-680.  If a proposal was determined to have "reasonable pricing," it would then be evaluated for past/present performance.  AR 2-680.

The past/present performance factor would be evaluated based on three elements: recency, quality, and relevancy.  AR 2-683 to -88.[7]  A recent contract was defined as "performance occurring within the last three . . . years, prior to the proposal submission date[;]" the recency rating for a prior contract would accordingly be Recent or Not Recent based on this requirement.  AR 2-674.  The quality of past performance would be determined by evaluating the questionnaires regarding prior contracts, as well as other sources such as performance reporting databases.  AR 2-686.  For the relevancy element, HUD would assign a rating of Very Relevant, Relevant, Somewhat Relevant, or Not Relevant for each prior contract submitted by the offeror, based on the number of properties per month for which the offeror (or subcontractor) performed asset management services of "essentially the same scope, magnitude of work and complexities that th[e] solicitation requires."  AR 2-684 to -85.  The "scope, magnitude of work and complexities" was defined as "not only [the] technical features and characteristics of each effort but also the programmatic and logistical considerations including but not limited to quantities, dollar values, type of contract, length of effort, [and the] type and complexity of data contractually required of the [o]fferor."  AR 2-685.

Each of the geographic areas available for award was assigned different threshold numbers of properties that would meet the relevancy rating requirements.  AR 2-684 to -85.[8]  For example, for Area 3A, prior experience marketing a minimum of 265 properties per month would receive a Very Relevant rating, and a minimum of 225 properties per month would receive a Relevant rating, as long as the marketing services generally matched the scope and type of services contemplated by the RFP.  AR 2-684.

In determining relevance, HUD would consider "the extent to which the offeror performed the work," and offerors were instructed to "identify the percentage of work if [it]

---

[7]The "quality" element was called "Performance Assessment" in the Technical Evaluation Panel reports.  *See, e.g.*, AR 8-3332 (Q Integrated's initial proposal evaluation, showing the three elements as Recency, Performance Assessment, and Relevancy).

[8]In an amendment to the RFP issued on September 5, 2014, HUD lowered these threshold numbers in response to concerns raised by offerors that a "small business" with less than $7 million in annual revenue could not have reasonably met the minimum number of past monthly sales to receive a Very Relevant or Relevant rating.  *See* AR 2-276 to -77, -290 to -91.  These numbers were significantly lowered a second time in the final conformed solicitation issued on September 4, 2015.  AR 2-684 to -85.

performed as a subcontractor on an incumbent contract." AR 2-674.  The RFP also stated:

> An [o]fferor [that] submits [p]ast [p]erformance [information] and worked as a subcontractor to a prime contractor who was an incumbent, and also performed a percentage of the work, must identify the actual numbers [the offeror] performed. These efforts shall include essentially the same scope, magnitude of work and complexities that this solicitation requires.

AR 2-674.  In a "Question and Answer" section appended to the final conformed solicitation, HUD provided the following explanation regarding the relative weight of a subcontractor past performance reference versus a reference for a prime contractor:

> Will HUD weigh [p]ast [p]erformance for [p]rime contractors and subcontractors differently? . . . If yes, we request HUD provide the weighting convention being applied.

> ANSWER: Subcontractors in [small business] set-aside areas are limited to performing less than 50% of the total effort.  As such, it is important to accurately state what functions are being performed by the subcontractors and the *overall corresponding percentage of work. No set weighting or number of submissions* is assigned to subcontractor versus prime performance, *and individual past performance evaluations for each of the three submissions will not be adjusted upward or downward*.  However, the [g]overnment *may adjust the overall confidence assessment upward or downward* depending on the relevancy of the submissions, *as well as the percentage of relevant work performed by the prime versus subcontractors.*

AR 2-698 (emphasis added).

Based on the recency, quality, and relevancy elements, HUD would then assign each offeror an overall past/present performance confidence rating of Excellent/High Confidence, Good/Significant Confidence, Fair/Some Confidence, No Confidence, and Neutral/Unknown Confidence.  AR 2-686 to -87.  The confidence rating represented the government's assessment of the offeror's "capabilities to successfully perform the Asset Manager Services effort."  AR 2-686.  The RFP stated that "[t]he [g]overnment will provide [o]fferors with an opportunity to address adverse [p]ast/[p]resent [p]erformance information if the [o]fferor . . . has not had a previous opportunity to respond to the information."  AR 2-686.  "Adverse" past/present performance information was defined in the RFP as "information that supports a less than satisfactory rating on any evaluation element or any unfavorable comments received from sources without a formal rating system."  AR 2-688.[9]

---

[9]The phrase "evaluation element" is not further defined in the RFP.  The court interprets it as meaning any element of the government's evaluation of an offeror's past or present performance (*i.e.*, the recency, quality, and relevancy elements), or any element of a performance evaluation submitted by a point of contact regarding a prior contract.  See AR 2-683 to -86

### C. *Evaluation of Proposals, discussions, and Award Decision*

#### 1. *Initial proposal evaluations.*

After a series of amendments to and deadline extensions for responding to the RFP, *see* AR 2-225 to -293, offerors submitted initial proposals for the Asset Management contracts by September 23, 2014, AR Tab 5. HUD completed its technical review of the proposals on July 17, 2015. AR 7-3246. Out of the 71 total offerors, 26 were determined to be "technically acceptable." AR 7-3246. HUD then analyzed whether the technically acceptable offerors' pricing was reasonable and balanced, based on an independent government cost estimate received on May 28, 2015, and later revised on August 10, 2015. AR 7-3247; *see also* AR 6-3218 to -3231 (initial cost estimate from May 2015); AR 6-3232 to -45. During the price analysis, HUD determined that one offeror submitted pricing that was not "reasonable," leaving 25 offerors in the competitive range. *See* AR 7-3253.[10] These 25 offerors did not necessarily bid for contracts in all twelve geographic areas; as a result, each area had between eight and eleven offerors in the competitive range. AR 7-3249 to -53.

HUD also gave initial past/present performance ratings to each of the offerors in the competitive range for each of the geographic areas included in their proposals. AR 8-3255 to -3822. Q Integrated was included in this evaluation as "Offeror 15." AR 8-3319 to -45; *see also* Mem. in Support of Pl.'s Mot. for Judgment on the Admin. Record ("Pl.'s Mot.") at 8, ECF No. 37-1. In its "list of clients," Q Integrated listed experience as a subcontractor to Matt Martin Real Estate Management, LLC ("Matt Martin") under HUD Asset Management contracts; Matt Martin's experience as the prime contractor for the incumbent contracts; and Q Integrated's separate experience as a prime contractor for Sperlonga Data Analytics, the City of Rock Hill, South Carolina, and the Japanese Maritime Self Defense Force. AR 5-1539 to -41.[11] Matt Martin was the incumbent prime contractor for Areas 1D, 2D, 4D, 5D, 2P, and 4S of the HUD Asset Management contracts. *See* AR 5-1540 to -41. For Areas 1D, 2D, and 2P, Q Integrated had been a subcontractor to Matt Martin since October 2013. AR 5-1539. Q Integrated's proposal under the new solicitation was to reverse these roles so that Q Integrated would serve as the prime contractor and Matt Martin would serve as the subcontractor, in part because Matt Martin no longer met the requirements for the small business set-aside contracts. AR 5-1543; *see also* TRO Hr'g Tr. 24:17 to 25:5 (Jan. 22, 2016), ECF No. 26 (explaining this reversal of roles). Q Integrated stated that it intended to "subcontract 49% of the work to [Matt Martin]." AR 5-1543.

---

(describing the government's independent evaluation of past/present performance and its use of "performance information from other sources").

[10]Between July and September 2015, one additional offeror was removed from the competitive range, leaving 24 offerors for the final source selection decision. *See* AR 12-5041.

[11]This list also included several other prior contracts for Matt Martin, many of which involved asset management services but were not directly related to the HUD contracts. AR 5-1541 to -42.

Although Q Integrated submitted a total of six past performance references (its three subcontracts to Matt Martin under the incumbent HUD contracts, and three of Matt Martin's prime contracts with HUD), AR 5-1544 to -52, HUD only evaluated the subcontract references. *See, e.g.*, AR 8-3325 (listing the three subcontracts as the "efforts" being evaluated); *see also* AR 2-673 (clarifying that the government would evaluate only three past performance references for each offeror, "inclusive of any submissions on behalf of subcontractors"). Q Integrated stated that these subcontracts "encompass[ed] 20% of the direct labor for the associated [p]rime [c]ontracts [with Matt Martin]." AR 5-1543. This 20 percent contribution was also reflected in the questionnaires that were returned by Matt Martin, describing Q Integrated's work as a subcontractor. *See, e.g.*, AR 5-1555 (stating that Q Integrated performed "approximately 20% of the direct labor").

For all of the geographic areas in Q Integrated's proposal, it received an overall past performance rating of "Fair/Some Confidence," which meant "the [g]overnment has a low expectation that the [o]fferor will successfully perform the required effort." AR 2-687, 8-3325 to -32. HUD included the following explanation for this rating:

> The [g]overnment rated the offeror a fair/some confidence rating due to the lack of relevance in [the pertinent geographic area]. Granted, the offeror's effort was recent and the offeror stated in Volume III that [it] serviced properties on all efforts that were within the Very Relevant threshold. However, once you factor in the admission from Matt Martin[,] the offeror's prime contractor, that the offeror only performed 20% of the work, as stated in line number 5 on all past performance [q]uestionnaire[s,] . . . [t]he *relevancy falls far below any acceptable threshold* for [the relevant geographic area]. However, the sub-contractor Matt Martin was rated highly in [its] performance under this effort. Based on the proposed offeror's sub[]contractor performance, and the fact that [Q Integrated] can only perform up to 49% of the cost of the work [under the incumbent contract], a fair/some confidence [rating] is warranted. The questionnaires submitted by Matt Martin staff are not from an unbiased third party, so consideration was given, but [the government] accorded this evaluation very little weight.

*E.g.*, AR 8-3327 (performance evaluation for Area 7A, repeated for every area under consideration in Q Integrated's proposal) (emphasis added).

With regard to the elements within the past performance rating (recency, quality, and relevancy), Q Integrated received Recent, Excellent, and Not Relevant ratings for almost every geographic area. AR 8-3332 to -45. The only exception was Area 3P, which is not at issue in this case, where Q Integrated received a Somewhat Relevant or Relevant rating. AR 8-3335, -3339, -3344. As discussed *supra*, the relevancy ratings were based on a minimum number of properties marketed per month, and these thresholds varied for each of the geographic areas. AR 2-684 to -85. Q Integrated's "Not Relevant" ratings resulted from an 80 percent reduction the government made to each of Q Integrated's reported monthly property volumes, based on the fact that Q Integrated provided only 20 percent of the direct labor under the incumbent HUD

contracts. *See, e.g.*, AR 8-3333 (Q Integrated's relevancy rating for Area 7A under "Past Effort 1," in which the government took Q Integrated's reported monthly average of 208 properties and reduced it to 41, which was "well below the 'somewhat relevant' intensity threshold").

Sage's initial proposal was evaluated as "Offeror 42" during this same process. AR 8-3600 to -27; *see also* Def.'s Opp'n to Pl.'s Mot. . . . & Cross-Mot. for Judgment on the Admin. Record ("Def.'s Cross-Mot.") at 10, ECF No. 39. Sage is a joint venture between Raine & Company, LLC ("Raine") and PEMCO, Limited ("PEMCO") in a mentor-protégé relationship approved by the SBA. AR 5-2663, -2827. Under this arrangement, Sage proposed that PEMCO would perform no more than 60 percent of the tasks for the new contracts, and Raine would perform no less than 40 percent of the tasks. AR 5-2827. Sage's client list information included Raine's and PEMCO's contracting efforts with HUD within the past three years. AR 5-2825 to -26. As its three past performance references, Sage chose to submit Raine's work between September 2010 and September 2013 as a designated closing agent in southern Alabama in support of the incumbent Asset Management contract, AR 5-2828 to -29, and well as two contracts for PEMCO's work as the incumbent Asset Management contractor for states that, under the new contracts, would constitute Areas 3A, 4A, 5A, and part of 6A (Tennessee),[12] as well as 1D, AR 5-2830 to -37.[13]

HUD gave Sage an overall past performance rating of "Good/Significant Confidence" for all geographic areas in its proposal. AR 8-3607 to -15. The government noted that Sage improperly aggregated Raine's prior HUD contracts, and therefore the relevance of each contract could not be determined. *See, e.g.*, AR 8-3607 (noting this issue for Area 3A). Accordingly, for the past performance elements (recency, quality, and relevancy), Sage received Recent, Excellent, and Not Relevant ratings for the Raine effort. AR 8-3615 to -19. Sage also received Recent and Good ratings for its two PEMCO efforts. AR 8-3619, -3624. The relevancy ratings for the PEMCO efforts varied from Very Relevant to Not Relevant, depending on the pertinent monthly numbers for each area proposed. AR 8-3619 to -27. Overall, the majority of these ratings (12 of 22 total) were Very Relevant. AR 8-3619 to -27.

2. *Discussions with offerors.*

HUD sent discussion letters to the competitive range offerors on August 27, 2015. AR Tab 9-4169 to -4220. The government did not conduct oral discussions, nor did it correspond with the offerors other than through the "discussion letters" and the questions and answers released with the final conformed solicitation on September 4, 2015. Each discussion letter was

---

[12]Under the prior incumbent Asset Management contract, the states of Illinois, Indiana, North Carolina, South Carolina, Tennessee, and Kentucky were all part of one geographic area awarded to PEMCO. AR 5-2830. This area was divided into multiple areas for the new solicitation.

[13]It appears that, under the prior incumbent Asset Management contract initiated in June 2010, both Matt Martin and PEMCO were serving as prime contractors for Area 1D. Matt Martin was a prime contractor under contract number C-OPC-23641, with a total contract value of $52.9 million. AR 10-4280, -4284. PEMCO was a prime contractor under contract number C-OPC-23642, with a total contract value of $38.3 million. AR 10-4565.

identical (aside from the offeror's name and address) and advised that "the period for discussions/exchanges is now open and written discussions are established." AR 9-4169 to -4220. Attached to each letter were brief "discussion points" regarding the offeror's technical, past performance, and price proposals. AR 9-4145 to -68. The letters advised the offerors that they could address the discussion points, in writing, in their final proposal revisions, from which HUD intended to make its award decision. *See, e.g.*, AR 9-4169.

Although the letters stated that the "discussion points" were "tailored" to each proposal, *see, e.g.*, AR 9-4169, the attachments were nearly identical for each offeror. Each attachment was one page long and stated:

[Offeror's Name] – Discussion Points

Technical Proposal

- No weaknesses or deficiencies

Past Performance Proposal

- No adverse past performance information

Price Proposal

- [List of areas for which the offeror bid] – Your total proposed price was evaluated as reasonable. The reasonable[ne]ss was determined on the basis for price competition by comparing your proposed price among offerors. Your total proposed price when compared to the percent difference from the overall mean was determined to be [comparative statement].

AR 9-4145 to -68. The "comparative statement" in the price proposal information indicated whether the offeror's price was higher or lower than the overall mean. *See, e.g.*, AR 9-4145. If the price was higher, the government added one sentence: "Offerors are reminded that additional discounts may be offered when revising your proposal." *See, e.g.*, AR 9-4147.

The discussion points for Q Integrated did not mention that it received a "Fair/Some Confidence" past performance rating in the initial evaluation, nor did they state that the relevancy ratings for all but one geographic area were considered "Not Relevant" and fell "far below any acceptable threshold" because the government reduced Q Integrated's total monthly properties to 20 percent of what it reported under the incumbent contracts. AR 9-4151 (omitting those statements in AR 8-3327). The discussion points also did not mention that Q Integrated's past performance questionnaires were given "very little weight" because they "were not from an unbiased third party." AR 9-4151. Similarly, the discussion points for Sage did not mention that it had improperly aggregated the contracts for Raine and had accordingly received "Not Relevant" ratings for that effort. AR 9-4165. Q Integrated's price was "lower" than the mean,

11

AR 9-4151, and Sage's price was "somewhat lower" than the mean, AR 9-4165.

3. *Evaluation of final proposal revisions and award selection.*

The offerors submitted their final proposal revisions by September 9, 2015, AR Tab 10, and the government made its source selection decision on September 25, 2015, AR 12-5090 to -98.  Sage was initially selected as the awardee for six of the twelve geographic areas: 4A, 7A, 8A, 1D, 4P, and 5P.  AR 12-5065.  Q Integrated bid for Areas 3A, 6A, 7A, 8A, 1D, 2D, 1P, 3P, 4P, and 5P but was not initially selected for any of these awards.  *See* AR 8-1254 (Q Integrated final proposal revision).

HUD's evaluations of Areas 7A, 1D, and 5P—the contested areas in this case—were similar in many respects.  In each area the government narrowed the selection decision to four offerors: Q Integrated, Sage, IEI-Cityside, JV ("IEI-Cityside"), and Alpine-First Preston JV IV ("Alpine-First Preston").  AR 12-5091, -5094, -5097.[14]  A fifth offeror, Capitol Asset Management, LLC ("Capitol Management"), was considered for Area 7A, but it received a past performance rating of "Neutral/Unknown Confidence" because its past performance material "was not considered relevant."  AR 12-5097.  Aside from Q Integrated, the remaining offerors received "Excellent/High Confidence" past performance ratings, with IEI-Cityside considered the most highly rated, followed by Alpine-First Preston, and then Sage.  AR 12-5091, -5094 to -95, -5098.

In its final proposal revision, Q Integrated only included the three past performance references for its subcontracts to Matt Martin under the incumbent HUD contracts, based on HUD's clarification that it would only evaluate three total references.  AR 10-4284 to -89.  In the summary of these efforts, Q Integrated removed the statements about providing 20 percent of the direct labor, and added statements that it "*participates in processing* 100% of the volume" associated with Areas 1D, 2D, and 2P.  AR-10-4286.  *Compare* AR 8-1543 to -48, *with* AR 10-4283 to -89 (emphasis added).  In the final evaluation of the past performance elements (recency, quality, and relevancy), Q Integrated received a Recent, Excellent, and Relevant rating for every geographic area on each of the three prior contracts.  AR 11-4686 to -95.  Unlike the initial evaluations, the government did not appear to automatically reduce Q Integrated's monthly property volumes by 80 percent, based on its percentage of direct labor under the prior contracts.  However, the government included a statement with each relevancy rating explaining that although Q Integrated's monthly totals fell within the Very Relevant range, "the scope, magnitude, and complexity of the effort matched so little of the solicitation [that] this effort was scored as [R]elevant."  *E.g.,* AR 11-4687 (relevancy rating for "Past Effort 1" for Area 3A, repeated for all other efforts and geographic areas).

Q Integrated again received a "Fair/Some Confidence" overall past performance rating for all the geographic areas in its proposal.  AR 11-4681 to 4695; *see also* AR 12-5091, -5094, -5097 (source selection decision).  The government offered the following rationale for this

_____

[14]IEI-Cityside withdrew its proposal from consideration in Area 1D on September 25, 2015.  AR 12-5091.

rating:

> The offeror's efforts were recent.  Additionally all the quantities on the number of properties serviced in a month meet[] the Very Relevant threshold.  The performance questionnaires submitted by Matt Martin, the prime contractor on all efforts, state that [Q Integrated] performed 20% of the work . . . .  However, [i]n the revised proposal, the [o]fferor states, "[Q Integrated] [k]ey [p]ersonnel processed 100% of the volume associated with . . . the award."  Based on the proposed offeror's sub-contractor performance, and the fact that [Q Integrated] can only perform up to 49% of the cost of the work [under the incumbent contracts], a fair/some confidence rating is warranted.  Also, the questionnaires that were submitted by Matt Martin staff are not from an unbiased third party, so consideration was given, but [the government] accorded this evaluation very little weight.  Since the prime, [Q Integrated], offered no past performance and was solely re[leg]ated to the position of a subcontractor[,] the government can't consider this work to match the scope, magnitude of work, and complexities of the solicitation.

E.g., AR 11-4682 (evaluation for Area 7A, repeated for all other geographic areas in Q Integrated's proposal).  In other words, although Q Integrated's element ratings of Recent, Excellent, and Relevant might have otherwise warranted a higher overall past performance rating, the government decided that the Fair/Some Confidence rating was appropriate because of ongoing concerns about the past performance references submitted by Q Integrated.

In Sage's final proposal revision, it removed the past performance reference for Raine and opted instead to use only PEMCO's work on the incumbent HUD Asset Management contracts for all three of its past performance references.  AR 10-4558 to -71.  The third PEMCO contract that was not part of the initial proposal included asset management services for states that, under the new contracts, constituted the remainder of Area 6A (Alabama and Mississippi), Area 7A, and part of Area 8A (Florida and Puerto Rico).  AR 10-4571.[15]  This change in past performance references raised Sage's overall past performance rating to "Excellent/High Confidence" for all the geographic areas in its proposal.  AR 11-4866 to -71.  For the past performance elements, Sage received Recent ratings for all three prior contracts.  AR 11-4872, -4875, -4879.  It received Excellent quality ratings for two of the contracts and a Good rating for the third.  AR 11-4872, -4876, -4879.  It also received Very Relevant ratings in all geographic areas for all three prior contracts.  AR 11-4872 to -82.  Many of the relevancy ratings for the PEMCO contracts improved between the initial and final evaluations because the monthly property thresholds for the geographic areas had been reduced substantially.  *See supra*, at 6 n.8.

The evaluation team did not appear to make any adjustments to the overall evaluation of Sage based on the fact that PEMCO was only permitted to perform at most 60 percent of the work under the joint venture agreement.  *E.g.*, AR 11-4874 ("[PEMCO state[s] an average

---

[15]Under the prior incumbent Asset Management contract, Georgia, Florida, Alabama, Mississippi, and Puerto Rico were all part of one geographic area awarded to PEMCO.  AR 10-4569.  This area was divided into multiple areas for the purposes of the new solicitation.

monthly inventory range of 310 to 970 . . . . This places [it] in the very relevant range. [PEMCO] also states that [it was] the prime and performed 100% of the work."). In the narrative for Sage's overall past performance rating, the evaluation team noted that "[Raine] will not have to be responsible for the majority of the work and [is] mentored by a current highly rated [Asset Management] contractor, [so] the government has a high expectation that [Sage] will successfully perform the required effort." *See, e.g.*, AR 11-4868 (narrative for Area 7A).

After the withdrawal of IEI-Cityside from Area 1D, Q Integrated was the lowest-priced offeror for that area ($[***] million), followed by Sage ($[***] million) and Alpine-First Preston ($[***] million). AR 12-5091. Q Integrated was also the lowest-priced offeror for Area 5P ($[***] million), followed by Sage ($[***] million), IEI-Cityside ($[***] million), and Alpine-First Preston ($[***] million). AR 12-5094. Capitol was the lowest-priced offeror for Area 7A ($[***] million), followed by Q Integrated ($[***] million), Sage ($[***] million), IEI-Cityside ($[***] million), and Alpine-First Preston ($[***] million). AR 12-5097. For all three areas, the government determined that Sage's offer provided the best value based on a trade-off between its higher past performance rating and the price difference over the lowest-priced offer ([***] percent for Area 1D, [***] percent for Area 5P, and [***] percent for Area 7A). AR 12-5092, -5095, -5098. The government also determined that the "slightly higher past performance rating[s]" of IEI-Cityside and Alpine-First Preston, as compared to Sage, did not justify the additional cost associated with these offerors. AR 12-5092, -5095, -5098.

### D. *Post-Award Debriefing and Subsequent Protests*

On September 30, 2015, HUD notified Q Integrated that Sage had received the contracts for Areas 7A, 1D, and 5P. AR 14-5129, -5139, -5149. Q Integrated requested a debriefing from the contracting officer, AR 31-5820, and the contracting officer e-mailed a debriefing letter on October 9, 2015, AR 15-5167 to -71. The letter stated that the debriefing content would be limited to:

1. The [g]overnment's evaluation of the significant weaknesses or deficiencies in the offeror's proposal, if applicable;
2. The overall evaluated cost or price, and technical rating, if applicable, of the successful offeror and the debriefed offeror, and past performance information on the debriefed offeror;
3. A summary of the rationale for award; [and]
4. Reasonable responses to relevant questions about whether source selection procedures contained in the solicitation, applicable regulations, and other applicable authorities were followed.

AR 15-5167 (quoting 48 C.F.R. (Federal Acquisition Regulations or "FAR") § 15.506(d) in part). Initially, the debriefing letter stated that Q Integrated's proposal was "Technically Acceptable" and did not contain any weaknesses or deficiencies. AR 15-5168. Second, it listed Sage's proposed prices for Areas 7A, 1D, and 5P, along with the awardees' prices for the other areas where Q Integrated's proposal was unsuccessful. AR 15-5168. Third, it included the rationale for Q Integrated's overall past performance rating of "Fair/Some Confidence," *see supra*, at 12, as well as a summary of the Recent, Excellent, and Relevant ratings it received

for each of the elements within this rating.  AR 15-5169 to -71.  Finally, the letter provided the following summary of the government's rationale for the award:

> Q Integrated had an Acceptable overall technical rating, and a "Fair/Some Confidence" past/present performance [rating].  Offeror[] Sage Acquisition . . . had an Acceptable overall technical rating, and a[n] "Excellent/High Confidence" . . . past performance [rating].  The [Technical Evaluation Panel] recommendation and the [Source Selection Authority] decision both affirmed that the "Excellent/High Confidence" . . . past/present performance rating of Sage Acquisition . . . provides the [g]overnment enough assurance of a positive outcome for the execution of the contract. . . . In the following areas, Q Integrated had lower pricing than the named awardee: . . . 7A ([***]% lower), 1D ([***]% lower) and 5P ([***]% lower).  The [Source Selection Authority] determined that it was worth paying the price premium indicated by [the] area in tradeoff to award to the higher past/present performance rating of the named awardees in these areas.

AR 15-5171.  Q Integrated had not asked any questions of the contracting officer to be addressed in the debriefing letter.  AR 15-5171.

On October 14, 2015, Q Integrated filed a protest with GAO of the awards to Sage in Areas 7A, 1D, and 5P.  AR 32-5827 to -61; AR 34-5871.[16]  Performance of the newly awarded contracts was suspended under the Competition in Contracting Act, 31 U.S.C. § 3553(d), during the pendency of the GAO protest.  AR 16-5217 to -20.  GAO dismissed Q Integrated's protest on December 29, 2015, citing a protest brought in this court by "another unsuccessful offeror," Precision, in Case No. 15-1495C filed on December 10, 2015.  AR 39-5933.  GAO noted that Precision's complaint "challenge[d] aspects of the agency's evaluation of proposals, including HUD's past/present performance evaluation, discussions, price analysis, and best value determination."  AR 39-5933.  GAO stated that it "will not decide a protest where the matter involved is the subject of litigation before a court of competent jurisdiction.  Even where the issues before the court are not the same as those raised in [GAO] by a protester, or are brought by a party other than the protester, [GAO] will not consider the protest if the court's disposition of the matter would render a decision by [GAO] academic."  AR 39-5933 to-34 (citing 4 C.F.R. § 21.11(b); *Schuerman Dev. Co.*, B-238464, B-238464.3, 91-2 CPD ¶ 286 (Comp. Gen. Oct. 3, 1991); *Geronimo Serv. Co.-Recon.*, B-242331, B-242331.3, 91-1 CPD ¶ 321 (Comp. Gen. Mar. 22, 1991)).  Q Integrated filed a request for reconsideration with GAO on December 30, 2015,

---

[16]Q Integrated initially challenged the awards to Sage in Areas 8A and 4P as well, but later withdrew these challenges.  AR 36-5913.  Q Integrated also challenged the awards to IEI-Cityside in Areas 3A, 6A, 1P, and 3P.  AR 36-5913.  However, after the SBA's size determination decision on November 10, 2015, finding that IEI-Cityside did not meet the small business requirements of the solicitation, the government terminated the award to IEI-Cityside.  AR Tab 33; AR 36-5913.  This mooted Q Integrated's protest for these areas, and GAO dismissed this portion of the protest on December 2, 2015.  AR 36-5913.

asserting that Precision's complaint related to Area 5A, for which Q Integrated did not submit a proposal, and consequently the court's decision in Precision's case would have no effect on Q Integrated's GAO protest.  AR 40-5935.  As of January 14, 2016, GAO had not issued a decision on the request for reconsideration.  Pl.'s Mot. at 11.

Q Integrated filed its protest in this court on January 19, 2016.  It submitted an application for a temporary restraining order and a motion for preliminary injunction on the same date.  Pl.'s Appl. for TRO and Mot. for Prelim. Inj., ECF No. 5.  After a hearing on January 22, 2016, the court denied the application for a temporary restraining order, in part because the government had agreed to "partial temporary relief in the form of a representation that it will not award any properties or actual work to Sage until April 1, 2016."  Order of Feb. 9, 2016, ECF No. 35.  The court also deferred and consolidated the motion for a preliminary injunction with the hearing on the merits of the protest.  *Id.*  Sage moved to intervene as a defendant on February 5, 2016, ECF No. 31, and the court granted this motion, ECF No. 33.  The administrative record was filed on February 4, 2016, and corrected on March 16, 2016.  Q Integrated moved for judgment on the administrative record on February 19, 2016, ECF No. 37, and the government and Sage submitted cross-motions for judgment on the administrative record on March 4, 2016, ECF Nos. 38 & 39.  These motions have been fully briefed and were addressed at a hearing on March 18, 2016.

E.  *SBA Size Determination Regarding Sage and Related Proceedings*

In February 2016, Sage was awarded contracts for two additional areas, 1P and 3P, after the original awardee, IEI-Cityside, was disqualified because SBA determined it was "other than small" for the purposes of the HUD Asset Management procurement awards.  *See* AR 33-5862 to -70 (SBA size determination); 36-5912 to -13 (GAO decision noting the awards to IEI-Cityside had been terminated); *see also* Pl.'s Mot. for Leave to File Am. Compl. at 1 ("Pl.'s Mot. to Amend"), ECF No. 43 (stating that Areas 1P and 3P had been awarded to Sage).  Q Integrated received the award for Area 6A as a result of IEI-Cityside's disqualification.  *See* Hr'g Tr. 80:2-3 (Mar. 18, 2016), ECF No. 48 (stating that Q Integrated became the awardee in Area 6A).

On March 8, 2016, approximately one week prior to the hearing on the parties' cross-motions for judgment on the administrative record, a field officer of the SBA issued another size determination decision finding that Sage "did not meet the small business size standard" for purposes of the HUD solicitation.  Def.'s Notice (Mar. 11, 2016), ECF No. 40.  The decision pertained to a protest by another unsuccessful offeror, ARNC/Bridge Consulting, of the award of Area 3P to Sage following IEI-Cityside's disqualification.  *Id.* Ex. A, at 4.  The SBA determined that Sage did not qualify for the mentor-protégé size exception under 13 C.F.R. § 121.103h(3)(iii), and therefore was "other than small" because of PEMCO's annual receipts.  *Id.* Ex. A, at 12.  SBA also found that the joint venture agreement between Raine and PEMCO did not comply with the requirements of 13 C.F.R. § 124.513(c)(2), which governs management of the joint venture, because Raine's project manager was limited in her control of the venture.  In that respect, SBA found that Sage's actions were in fact controlled by a "management committee."  *Id.* Ex. A, at 9.  SBA also determined that the information in the joint venture agreement regarding Sage's "work flow plan" was either insufficient under 13 C.F.R. § 124.513(d) or not properly included in Sage's proposal to HUD.  *Id.* Ex. A, at 10-11.

In light of this development, the court rescinded its order of February 9, 2016, which consolidated plaintiff's motion for a preliminary injunction with the merits of this case, and established a schedule for renewed proceedings on the motion for a preliminary injunction. Order of Mar. 18, 2016, ECF No. 46. The court also suspended further consideration of the cross-motions for judgment on the administrative record, pending a final decision by the SBA on the size determination regarding Sage. *Id.*

On March 22, 2016, Sage appealed the size determination to SBA's Office of Hearings and Appeals ("OHA"). *See* Def.'s Notice (Mar. 31. 2016) Ex. 2, at 1, ECF No. 60. Concurrently, Sage sought reconsideration by the SBA field office based on "factual misperceptions" in the decision. *See* Hr'g Tr. 65:1-3, 16-25 (Mar. 18, 2016). Sage also asserted that because SBA had previously determined, in a decision on November 4, 2015, that Sage was a small business for the purposes of the HUD solicitation, and because this decision was not appealed within the designated time, the prior decision constituted "the final decision of the agency" pursuant to 13 C.F.R. § 121.1101(a). *See* Def.-Interv.'s Reply in Support of Its Cross-Mot. for Judgment on the Admin. Record ("Def.-Interv's Reply") at 9, ECF No. 45. SBA rescinded its March 8, 2016 size determination on March 28, 2016, concurring with Sage that the November 2015 size determination was the agency's final decision, and noting that SBA cannot reopen a prior size determination beyond the appeal period. Def.'s Notice (Mar. 31, 2015) Ex. 1, at 3. SBA's Office of General Counsel also requested that OHA dismiss as moot Sage's appeal of the March 8th decision based on this decision. *Id.* Ex. 1, at 1. OHA dismissed the appeal on April 5, 2016, *see* Pl.'s Notice (Apr. 8, 2016) Ex. 1, ECF No. 68, but Q Integrated advised that it was filing an appeal on April 8, 2016, contesting the validity of the March 29th recission, *id.*

Following a hearing on March 30, 2016, the court denied plaintiff's motion for a preliminary injunction, citing the harm that would be caused by disrupting HUD's arrangements to begin asset-management work under the new contracts on April 1, 2016. Order of Mar. 31, 2016, ECF No. 63. The court concurrently restored consideration of the parties' motions for judgment on the administrative record. Order of Mar. 31, 2016, ECF No. 64. These motions are now ready for disposition.[17]

---

[17]On March 17, 2016, the day before the hearing on the parties' motions for judgment on the administrative record, Q Integrated filed a motion for leave to amend its complaint under RCFC 15(a)(2). Plaintiff asked to add Areas 8A, 1P, 3P, and 4P, all of which were awarded to Sage at the time of the motion, to the contested areas in this case. Pl.'s Mot. to Amend at 1. In its response, the government asserted that Q Integrated withdrew its GAO protest of Areas 8A and 4P in November 2015 because Q Integrated "would not otherwise be in line for award for [these areas]," and work began on these contracts in January 2016. Def.'s Resp. to Pl.'s Mot. to Amend ("Def.'s Resp.") at 2, ECF No. 66 (citing AR 35-5889); *see also* AR 12-5076, -5086 (showing that Q Integrated's offered price was higher than Sage's in both areas). The government also stated that the awards to Sage of Areas 1P and 3P have been in place since February 19, 2016, and Q Integrated had neither protested these awards at GAO nor in this court prior to its motion to amend. *Id.* at 2-3. Because work on these four areas has been underway for weeks, putting them in a different posture than the three areas originally contested in plaintiff's complaint, and because plaintiff did not request to add these areas until the day before

## JURISDICTION

Pursuant to the Tucker Act, this court has jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1), added by the Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996); *see also Systems Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380-81 (Fed. Cir. 2012).  Accordingly, the court has jurisdiction over this protest.

## STANDARDS FOR DECISION

The Administrative Procedure Act ("APA"), specifically 5 U.S.C. § 706, governs the court's review of an agency's contract award.  *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.").  Under this statutory command, the court addresses whether a procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The court may set aside a procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  An agency's decision lacks a rational basis when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

---

the merits hearing, the court concludes that justice does not require allowing plaintiff to add these four areas to its complaint.  *See* RCFC 15(a)(2) (stating that the court may give leave to amend "when justice so requires").

Plaintiff also requested leave to "conform its [c]omplaint to arguments [raised] in pleadings filed by the parties," particularly with respect to its arguments regarding the government's evaluation of Sage's past performance.  Pl.'s Mot. to Amend at 1-2.  The government asserted that plaintiff's request in this regard is also untimely given that the merits of the case were fully briefed and the hearing was scheduled for the following day.  Def.'s Resp. at 3.  The court agrees that plaintiff's request to add arguments to its complaint is untimely, but notes that in reaching a decision in this case, it has taken into consideration all arguments advanced in the parties' briefs and at the hearing on the merits.

Finally, plaintiff requested leave to add to its complaint a protest that Sage did not meet the size requirements of the solicitation, based on the March 8, 2016 SBA size determination.  Pl.'s Mot. to Amend at 1-2.  The government responded that SBA's March 8th decision has since been rescinded, and that even if it was still valid, the appeal process at OHA has not yet been exhausted.  Def.'s Resp. at 5.  In light of the procedural posture of the SBA's size determination, the court will not at this time consider Q Integrated's protest in this regard.

Accordingly, plaintiff's motion to amend its complaint is DENIED.

29, 43 (1983)).  The court may not, however, "substitute its judgment for that of the agency." *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part by Califano v. Sanders*, 430 U.S. 99, 105 (1977)).

## ANALYSIS

A.  *The Government's Evaluation of Q Integrated's Past Performance Information*

Q Integrated argues that the government improperly evaluated its past performance information, with the result that Q Integrated unfairly received an overall past performance rating of Fair/Some Confidence.  Pl.'s Mot. at 19-26.  Q Integrated points to the fact that its ratings for the "relevancy" element were downgraded from "Very Relevant" to "Relevant," and its overall rating was "Fair/Some Confidence" rather than "Excellent/High Confidence," based primarily on the fact that it served as a subcontractor in the contracts it submitted as past performance references.  Pl.'s Mot. at 19-24 (citing AR 11-4686 to -95 (relevancy ratings), -4682 (overall rating for Area 7A)).  Plaintiff asserts this was improper for three reasons: (1) the solicitation stated that relevancy ratings would be based only on the prior monthly volume of transactions, (2) the solicitation also stated that there was "no set weighting" for work as a subcontractor versus as a prime contractor, and (3) the government applied an "unstated direct labor metric" to downgrade Q Integrated's sales volume, thereby also lowering its past performance ratings.  *Id.*  Plaintiff's arguments center on the change that it made to the past performance information in its final proposal, in which it removed statements that it provided about 20 percent of the direct labor as a subcontractor to Matt Martin, and instead stated that it "*participate[d] in processing* 100% of the volume" under those contracts.  *Compare* AR 8-1543 to -48, *with* AR 10-4283 to -89.  As Q Integrated would have it, the government should have accepted its volume metrics as stated and not adjusted either the relevancy ratings or the overall past performance rating based on Q Integrated's previous performance as a subcontractor.

Q Integrated further argues that the government improperly gave "very little weight" to its past performance questionnaires, based on the fact that the questionnaires were completed by Matt Martin, Q Integrated's prime contractor for the work covered by the questionnaires and its proposed subcontractor for the new contracts.  Pl.'s Mot. at 24-26.  According to Q Integrated, it was "irrational" for the government to assume that the Matt Martin questionnaires were "not impartial" without having actual, direct proof of bias.  *Id.* at 25.   Q Integrated also notes that HUD had reason to believe that the questionnaires were actually unbiased and accurate because Matt Martin was the incumbent HUD contractor and had received more than satisfactory ratings on its previous work while Q Integrated was the subcontractor.  *Id.* at 26.

"Agencies are given 'broad discretion' in evaluating past performance information, including the extent to which a prior contract is considered 'relevant.'"  *Innovative Test Asset Solutions, LLC v. United States*, 125 Fed. Cl. 201, 226 (2016) (citing *Glenn Defense Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 910-11 (Fed. Cir. 2013)); *see also PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 539 (2010) ("At the outset, it is important to note that what does or does not constitute 'relevant' past performance falls within the [Source Selection Authority's] considered discretion.").  In accord with the "arbitrary and capricious" standard, this

court will review an agency's past performance evaluation to the extent that it was "reasonable" and consistent with the solicitation's evaluation criteria and applicable law and regulations. *Innovative Test*, 125 Fed. Cl. at 226 (citing *RISC Mgmt. Joint Venture v. United States*, 69 Fed. Cl. 624, 634 (2006); *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 659 (2002)).  An evaluation authority is also given "broad discretion" in assigning an overall past performance rating based on various subfactors, including past performance questionnaires, as long as the agency has established a "rational basis" for its decision and stated a "reasonable interpretation of the [underlying] facts."  *Glenn Defense*, 720 F.3d at 910 (finding that the government's past performance rating of "Less than Satisfactory" was rational even when the underlying past performance questionnaires rated the offeror as "Satisfactory" or higher).

The court cannot conclude that the government's evaluation of Q Integrated's past performance was arbitrary or capricious, or otherwise lacked a rational basis.  The solicitation stated that the relevancy element of the past performance rating would be based on the volume of properties for which the offeror performed asset management services of "essentially the same scope, magnitude of work and complexities" as the work contemplated by the solicitation.  AR 2-684 to -85.  Offerors were instructed to "identify the percentage of work if [they] performed as a subcontractor."  AR 2-674.  HUD stated that this percentage was to represent the "overall corresponding percentage of work" represented by the "functions . . . being performed by the subcontractor."  AR 2-698.  Contrary to Q Integrated's argument, these aspects of the solicitation suggest that the government intended to evaluate the actual percentage of work performed by the subcontractor in relation to the contract as a whole, not the percentage of work in which the subcontractor "participated."

Although HUD indicated there would be "[n]o set weighting or number of submissions . . . assigned to subcontractor versus prime performance," it also stated that "the [g]overnment may adjust the overall confidence assessment upward or downward depending on . . . the percentage of relevant work performed by the prime versus subcontractors."  AR 2-698.  This is what happened in the case of Q Integrated's past performance references.  In its final proposal revision, Q Integrated stated that it "participate[d] in processing 100% of the volume" associated with the incumbent contracts under which Matt Martin was the prime contractor and Q Integrated was the subcontractor.  AR 10-4283 to -89.  However, the evaluation team reasonably determined that this was not an accurate reflection of Q Integrated's  "overall corresponding percentage of work," because the incumbent contracts were small business set-aside contracts in which subcontractors were limited to no more than 49 percent of the work.  *See* AR 11-4682.  In effect, the evaluation team had a reason for adjusting the rating for the relevancy element from Very Relevant to Relevant for each of the proposed areas, even though HUD had stated in an answer to a question that for subcontractor versus prime performance "individual past performance evaluations for each of the three submissions will not be adjusted upward or downward."  *See supra*, at 7 (quoting AR 2-698).  This inconsistency with HUD's stated interpretation of the solicitation is not determinative of error, however.  Taking into account the entirety of  HUD's answer to the question about subcontractor performance, the evaluation team was on firmer ground for "adjusting downward" Q Integrated's overall past performance rating based on the team's assessment that Q Integrated's performance as a subcontractor did not "match the scope, magnitude of work, and complexities of the solicitation."  AR 11-4682.

Correlatively, the court cannot conclude that the evaluation team lacked a rational basis to assign Q Integrated a Fair/Some Confidence overall past performance rating because of concerns about the impartiality of its past performance questionnaires.  Although the combination of Q Integrated's ratings for the past performance elements (Recent, Excellent, and Relevant) logically might have led to a higher overall rating than Fair/Some Confidence, the team had discretion to recommend a lower score based on concerns not reflected in these ratings. *See Glenn Defense*, 720 F.3d at 910.  Although Q Integrated's arguments suggest that the government needed direct or significant circumstantial proof that the Matt Martin questionnaires were skewed before the team could take potential bias into consideration in their rating, this is simply not the case.

Accordingly, the court concludes that the government's evaluation of Q Integrated's past performance information and assignment of a Fair/Some Confidence rating based on this information was not arbitrary or capricious.

### B.  *The Government's Evaluation of Sage's Past Performance Information*

Q Integrated next argues that the government's evaluation of Sage's past performance information was irrational because Raine, the protégé in Sage's mentor-protégé relationship, did not have experience doing asset management work, and because the evaluation applied an "unstated preference" for joint venture arrangements.  Pl.'s Mot. at 30-34.  Q Integrated asserts that Raine's experience prior to the solicitation consisted solely of closing real estate transactions, which would be a minor part of the successful offeror's responsibilities under HUD's Asset Management contracts.  *Id.* at 32.  Accordingly, Q Integrated asserts that there can be no rational basis for the government's decision to assign Sage an overall past performance rating of Excellent/High Confidence based solely on the mentor's (PEMCO's) experience.  *Id.* Q Integrated also argues that the evaluation team unfairly credited joint ventures like Sage for the past performance experience of other-than-small joint venture partners because "large" partners are permitted to perform up to 60 percent of the work, whereas in a prime-subcontractor relationship, "large" subcontractors are limited to performing 49 percent of the work.  *Id.* at 33. As Q Integrated would have it, the solicitation should have explicitly stated there was a preference for joint ventures in terms of the past performance evaluation, in which case Q Integrated "could have formed a joint venture with [Matt Martin]."  *Id.* at 33.

As discussed *supra*, source selection authorities have broad discretion in conducting past performance evaluations.  This court will only look to whether past performance ratings are reasonable and consistent with the terms of the solicitation and applicable regulations.  *See, e.g.*, *Innovative Test*, 125 Fed. Cl. at 206.  In this instance, the government's evaluation with regard to Sage was consistent with the terms of the solicitation, even though those terms may have led to an unusual and not particularly fair result.  The solicitation instructed each offeror to submit past performance references for its "three most recent and relevant contracts," which could include references for subcontractors or joint venture partners.  AR 2-673.  Indeed, in the final version of the solicitation, the government clarified that it would "evaluate *only* three past performance references."  AR 2-673 (emphasis added).  Offerors with more than three recent, relevant contracts were free to decide which three past performance references to include in their final proposal revisions.  Under the terms of the solicitation, only these three performance references

mattered; there was no requirement to consider, for example, whether those three performance references adequately accounted for the experience of all joint venture partners, as Q Integrated suggests the evaluation team should have done.  And, the government indicated that it would consider "the nature of the work, criticality of work, and percentage of overall work" represented by the references.  AR 2-673.

In its initial proposal, Sage included one contract for Raine's prior experience and two contracts for PEMCO's prior experience.  AR 5-2828 to -37.  In its final proposal revision, however, Sage decided to include three prior contracts for PEMCO.  AR 10-4558 to -71.  This change increased Sage's overall past performance rating from Good/Some Confidence in the initial evaluation to Excellent/High Confidence in the final evaluation.  AR 11-4866 to -71.  Based on the terms of the solicitation, the government had a rational basis for assigning this rating to Sage because PEMCO's contracts were recent, its monthly asset management volumes fell within the Very Relevant range, and its quality ratings were either Good or Excellent.  AR 11-4872 to -82.  Q Integrated suggests it also would have been reasonable for the evaluation team to consider the fact that the performance references only represented PEMCO's experience and PEMCO was limited to 60 percent of the work under the terms of the mentor-protégé joint venture agreement.  But in fact, the evaluation team did just that.  It noted this division of labor in the narrative for the overall rating, but determined that "[s]ince [Raine] will not have to be responsible for the majority of the work and [is] mentored by a current highly rated [Asset Management] contractor, the government has a high expectation that [Sage] will successfully perform the required effort."  *See, e.g.*, AR 11-4868.  The court cannot conclude that this assessment was irrational.

There is no doubt that, under the solicitation's terms governing evaluation of past performance, Sage benefited significantly from the fact that it was an approved mentor-protégé joint venture between Raine and PEMCO.  Although Q Integrated's subcontractor Matt Martin appears also to have had excellent past performance ratings, Q Integrated did not obtain credit for those ratings.  This difference stems largely from the business structure employed by the two offerors; HUD completely ignored the fact that Q Integrated had broader and more extensive relevant prior work than did Raine.  Nonetheless, Q Integrated has failed to show that this was the product of an "unstated evaluation criteri[on]," or that the government's evaluation of Sage's past performance in this manner was otherwise irrational.  The record shows that the benefit to Sage derived more from the fact that Sage elected to submit PEMCO's prior contracts rather than Raine's prior contracts as its three past performance references.  As discussed *supra*, the solicitation stated that offerors could submit three past performance references "inclusive of . . . submissions on behalf of subcontractors."  AR 2-673.  Accordingly, Q Integrated could have submitted past performance references for its other-than-small subcontractor, Matt Martin, just as Sage submitted past performance references for its other-than-small joint venture partner, PEMCO.  Q Integrated did not do so; if it had, the government may or may not have considered the fact that, under a small business set-aside contract, Matt Martin was permitted to perform up to 49 percent of the work, just as it considered that PEMCO was permitted to perform up to 60 percent of the work as an approved mentor to Raine.  While it is true that the evaluation team noted that joint venture partners are permitted to perform a greater percentage of the work than subcontractors, *e.g.*, AR 12-5091, this circumstance is attributable to regulations, *compare* 13 C.F.R. § 124.513(d)(2)(i) (performance requirements for mentor-protégé joint ventures), *with* 13

C.F.R. § 125.6(a) (performance requirements for prime and subcontractors). The government is not obligated to explain to offerors the applicable regulations or the relative advantages of using a particular business organization and arrangement under these regulations.

Accordingly, the court concludes that the government's evaluation of Sage's past performance information and assignment of an Excellent/High Confidence rating based on this information was not arbitrary or capricious.[18]

### C. *The Adequacy of the Government's Discussions with Q Integrated*

Q Integrated further argues that the government violated the terms of the solicitation and applicable regulations by failing to hold "meaningful discussions" with it. Pl.'s Mot. at 26-30. Specifically, Q Integrated asserts that the government should have disclosed the fact that its past performance references were considered "Not Relevant" in the preliminary evaluation and that the evaluation team had concerns about the impartiality of the past performance questionnaires submitted by Matt Martin. *Id.* at 28-30. According to Q Integrated, the government's failure to disclose these weaknesses, or to provide any other meaningful commentary about the past performance evaluation, deprived Q Integrated of the opportunity to address these concerns or make pertinent revisions to its final proposal. *Id.* at 29.

The government has the option of conducting discussions with offerors after establishing a competitive range. FAR § 15.306(d). Such discussions must be "tailored to each offeror's proposal." FAR § 15.306(d)(1). The government does not need to disclose "every area where the proposal could be improved," and "[t]he scope and extent of discussions are a matter of contracting officer judgment." FAR § 15.306(d)(3). Nonetheless, the contracting officer must "[a]t a minimum, . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." *Id.*

A deficiency is defined as "a material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." FAR § 15.001. A significant weakness is defined as "a flaw [in the proposal] that appreciably increases the risk of unsuccessful contract performance." *Id.* These definitions have been inconsistently applied in decisions by this court and the GAO. *See* John Cibinic, Jr., et al., *Formation of Government Contracts* 894 (4th ed. 2011) ("Subsequent decisions provide little confidence that deficiencies and significant weaknesses can be distinguished from other matters that must be discussed."). Many decisions emphasize that deficiencies and weaknesses must be "material," granting

---

[18]Q Integrated also argues that the government's "past performance/price trade-off determination was irrational" in light of "[Q Integrated's] and Sage's properly evaluated past performance ratings." Pl.'s Mot. at 34-36. This argument assumes that Sage should have received a "Fair/Some Confidence" past performance rating and Q Integrated should have received at least that rating, if not higher. *Id.* at 35. Because the court has concluded that the government's evaluation of the past performance information for both offerors was not irrational, it need not address Q Integrated's arguments in this regard.

protests where the matter in question precluded the offeror from receiving the award, and denying protests where disclosing the matter would not have improved the offeror's chance for award. *Id.* at 894-95 (citing numerous cases, including *Cube Corp. v. United States*, 46 Fed. Cl. 368, 384 (2000) ("Plaintiff has not demonstrated how [disclosure of the evaluation information] would have improved materially Cube's chance for award."), and *CRAssociates, Inc.*, B-282075.2, 2000 CPD ¶ 63, 2000 WL 365909 (Comp. Gen. Mar. 15, 2000) ("Had the agency pointed out these matters, CRA could have added additional information . . . . Discussions cannot be meaningful where, as here, the agency fails to advise the offerors, in some way, of material proposal deficiencies.")); *see also Caddell Constr. Co. v. United States*, 125 Fed. Cl. 30, 45 (2016) ("[W]hen discussions occur, the contracting officer must accurately identify weaknesses. An error in communicating a weakness that causes an offeror to revise its proposal is quintessentially a misleading discussion.") (citing *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 369 (2009)).

In effect, adverse past performance includes both negative information about the offeror received from references, as well as any other past performance information that would rise to the level of a deficiency or significant weakness. Like deficiencies and significant weaknesses, this court has generally found that adverse past performance information is information that materially affects an offeror's past performance rating or chance of receiving the award. *E.g.*, *Afghan American Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 365 (2009) (denying a protest where undisclosed past performance information was "insufficiently 'adverse' to cause a downward change in [the protestor's] past performance rating"); *Fort Carson Support Servs. v. United States*, 71 Fed. Cl. 571, 608 (2006) (finding that certain performance information was "adverse," but the Army was not required to disclose it because "the information did not affect the Army's decision"). In this instance, the solicitation contained a definition for "[a]dverse [p]ast/[p]resent performance" information, namely, "*information that supports a less than satisfactory rating on any evaluation element* or any unfavorable comments received from sources without a formal rating system." AR 2-688 (emphasis added). The solicitation affirmatively stated that "[t]he [g]overnment will provide [o]fferors with an opportunity to address adverse [p]ast/[p]resent [p]erformance information if the [o]fferor . . . has not had a previous opportunity to respond to the information." AR 2-686.

The court concludes that during its discussions, the government failed to disclose to Q Integrated that its past performance submission either showed "significant weaknesses" or constituted "adverse past performance information," in contravention of FAR § 15.306(d)(3) and the definitional terms of the solicitation. On its initial proposal evaluation, Q Integrated received a rating of Not Relevant in nine of the ten geographic areas for which it bid, including the three contested areas at issue in this case. AR 8-3332 to -45. This rating resulted from an 80 percent reduction the evaluation team made to the monthly property volume reported by Q Integrated, based on the fact that Q Integrated performed 20 percent of the direct labor under its prior contracts. *E.g.*, AR 8-3333. In particular, the government found that "the relevancy falls far below any acceptable threshold." AR 8-3327. The government cited these relevancy ratings as the main reason Q Integrated received a Fair/Some Confidence overall past performance rating. *E.g.*, AR 8-3327 ("The [g]overnment rated the offeror a fair/some confidence rating due to the lack of relevance in Area 7A."). These relevancy ratings constituted "adverse past performance information" under the terms of the solicitation because Q Integrated received a "less than

satisfactory rating on [an] evaluation element." However, the government did not disclose these ratings to Q Integrated during discussions, stating instead in the "discussion points" that there was "[n]o adverse past performance information" for Q Integrated. AR 9-4151.[19]

After the final proposal revision, the government raised Q Integrated's relevancy ratings to Relevant, but this still reflected a reduction to Q Integrated's monthly property volumes, which would otherwise have been in the Very Relevant range. AR 11-4686 to -95. The government also maintained its "Fair/Some Confidence" overall past performance rating for Q Integrated, again citing the fact that Q Integrated's past performance references only reflected work as a subcontractor. AR 11-4681 to -95. In that respect, Q Integrated could have reasonably expected some downward adjustment of its overall past performance rating because its past performance references pertained to work as a subcontractor rather than as a prime contractor. HUD previously stated that "the [g]overnment *may adjust the overall confidence assessment upward or downward* depending on the relevancy of the submissions, as well as the percentage of relevant work performed by the prime versus subcontractors." AR 2-698 (emphasis added). Even so, HUD also stated that "[n]o set weighting or number of submissions is assigned to subcontractor versus prime performance, *and individual past performance evaluations for each of the three submissions will not be adjusted upward or downward*." AR 2-698 (emphasis added). Contrary to this statement in the solicitation, HUD did in fact adjust downward Q Integrated's ratings for each of its past performance references by changing the relevancy ratings from Very Relevant to Not Relevant (in the initial evaluation) and from Very Relevant to Relevant (in the final evaluation). Despite this adjustment, HUD stated to Q Integrated in its "discussion points" that there was "[n]o adverse past performance information" related to its proposal. AR 9-4151. The government reiterated this point in its debriefing letter to Q Integrated, stating that "no weaknesses or deficiencies were found" in its proposal. These statements were incorrect.

The government's concerns about the relevance of Q Integrated's prior experience constituted "significant weaknesses" or "adverse past performance information" within the meaning of FAR § 15.306(d)(3) and the specific definitions in the solicitation. The rating of "Fair/Some Confidence" meant that "the [g]overnment ha[d] a low expectation that [Q Integrated] w[ould] successfully perform the required effort." AR 2-687. Because the relevancy ratings and associated concerns were the primary reason for this rating, they fall within the FAR's definition of a significant weakness as "a flaw [in the proposal] that appreciably increases the risk of unsuccessful contract performance." FAR § 15.001. Q Integrated had not had "a previous opportunity to respond" to these concerns because the government did not communicate with offerors during the procurement process other than through the boilerplate discussion letters and the questions and answers appended to the various solicitation drafts. The government's decision to adjust Q Integrated's relevancy ratings downward adversely affected Q Integrated's overall past performance rating. *See Afghan American*, 90 Fed. Cl. at 365. This in turn materially reduced Q Integrated's chance of receiving the contract awards, because Q Integrated would have otherwise received a higher past performance rating, and it was the lowest-priced or

---

[19]This affirmative misstatement also runs afoul of the precept implied by FAR § 15.306(d), (e) that discussions must not be "misleading." *Caddell Constr.*, 125 Fed. Cl. at 45.

second-lowest-priced offeror within the contested areas. *See Fort Carson*, 71 Fed. Cl. at 608. Although the government had broad discretion in assigning Q Integrated a lower overall performance rating based on its concerns, *see supra*, at 19, it nevertheless had an obligation to disclose information about these significant weaknesses or adverse past performance information during discussions. *See* FAR § 15.306(d)(3); *Caddell Constr.*, 125 Fed. Cl. at 45-46. Not only did the government fail to do so, but it affirmatively misstated that there were no weaknesses or adverse past performance information associated with Q Integrated's proposal.

Similarly, the government's determination that the past performance questionnaires submitted by Matt Martin were "not from an unbiased third party" was a significant weakness or adverse past performance information under FAR § 15.306(d)(3). The evaluation team's reports do not state the extent to which this particular determination harmed Q Integrated's overall past performance rating. However, because the team noted this issue in its overall past performance rating narrative for both the initial evaluation, *e.g.*, AR 8-3327, and the final evaluation, *e.g.*, AR 11-4682, the court concludes that it had an adverse effect on the overall rating, which in turn materially impacted Q Integrated's chance of receiving the awards. The final evaluation specifically said: "[the questionnaires] are not from an unbiased third party, so consideration was given, but it accorded this evaluation *very little weight*." AR 11-4682 (emphasis added). The government should have disclosed these concerns to Q Integrated during the discussions.

Accordingly, for the two independent reasons stated *supra*, the court concludes that the government's discussions with Q Integrated "involved a violation of regulation or procedure," *Impresa Construzioni*, 238 F.3d at 1332, with respect to the procurement awards at issue.

### D.   *Whether Q Integrated Was Prejudiced*

Although the court has concluded that HUD's procurement violated applicable regulations and contravened the solicitation, it may only grant relief if the protestor "demonstrates that it was prejudiced by the error." *Springfield Parcel C, LLC v. United States*, 124 Fed. Cl. 163, 193 (2015) (citing *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 203 (2004), *aff'd*, 389 F.3d 1219). In a post-award protest by a disappointed offeror, "[t]he protestor must show that there was a substantial chance it would have received the contract award, but for the alleged error in the procurement process." *Id.* (citing *Information Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

As discussed *supra*, the government's decision to lower Q Integrated's overall past performance rating to "Fair/Some Confidence" materially and adversely affected its chance to receive the contract awards. Had the government disclosed its concerns about the relevance of Q Integrated's prior experience or the impartiality of Matt Martin's past performance questionnaires, Q Integrated could have taken a number of steps to mitigate those concerns in its final proposal revision. The most obvious step would have been to submit Matt Martin's prior contracts as its three past performance references, similar to Sage's decision to submit three PEMCO references in its final proposal revision as permitted by the solicitation. *See* AR 2-673 ("inclusive of any submissions on behalf of subcontractors"). This presumably would have eliminated HUD's concerns about the impartiality of the past performance questionnaires, since the questionnaires would have been completed by HUD personnel overseeing the incumbent

contracts. *See* AR 5-1589 to -1621 (questionnaires completed by HUD for Matt Martin in Q Integrated's initial proposal). It may well have also mitigated HUD's concerns about the monthly property volumes, because Matt Martin, like PEMCO, was the prime contractor on the incumbent contracts. Q Integrated was the lowest-priced offeror in two of the three contested areas, and it was the second-lowest-priced offeror in the third area, where the lowest-priced offeror received a "Neutral/Unknown Confidence" past performance rating. Therefore, there was a substantial chance that Q Integrated would have received the contract awards if it had received a higher past performance rating. Accordingly, Q Integrated was prejudiced by the government's violation of the applicable regulation and related provisions in the solicitation.

## E. *Whether Equitable Relief Is Warranted*

"To afford relief in [a bid protest], the court[] may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2). Q Integrated has requested that the court permanently enjoin the awards of the contested areas to Sage. Compl. at 16-17. "To determine if a permanent injunction is warranted, the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA*, 389 F.3d at 1228-29). In deciding whether to grant a permanent injunction, the court can tailor the specific relief to fit the circumstances at hand. *Geo-Seis Helicopters, Inc. v. United States*, 77 Fed. Cl. 633, 649 (2007) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

Q Integrated has succeeded on the merits of its protest. In terms of the second factor, the loss of profits and the opportunity to work under a contract can constitute irreparable harm because monetary relief under Paragraph 1491(b)(2) is limited to bid preparation and proposal costs. *See, e.g.*, *Springfield Parcel*, 124 Fed. Cl. at 194; *Furniture by Thurston v. United States*, 103 Fed. Cl. 505, 520 (2012). Generally also, an offeror can be irreparably harmed when it loses the "opportunity to compete on a level playing field for a contract." *Geo-Seis*, 77 Fed. Cl. at 647 (quoting *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 571 (2000)). In addition, the public interest is served by injunctive relief where the court has concluded that the government violated an applicable regulation and related provisions in the solicitation, and "maintenance of the integrity of the procurement process weighs heavily in favor of granting a permanent injunction." *Springfield Parcel*, 124 Fed. Cl. at 195. The defendants agree that this is a public interest, *see, e.g.*, Def.'s Cross-Mot. at 41, and they offer no countervailing public interest.

The balance of the hardships in this case is more difficult to determine. An award of bid preparation and proposal costs, standing alone, would not be adequate here. The government had agreed to "not award any properties or actual work to Sage until April 1, 2016" due to the pendency of this protest. Order of Feb. 9, 2016. This deadline has now passed, however, and HUD presumably has moved forward with the award in the contested areas. The government also represented that, because of various delays in awarding these contracts, the base period will expire on May 31, 2016, and the government will exercise the first one-year option period on June 1st. Hr'g Tr. 80:3-5, 86:7-18 (Mar. 18, 2016); *see also* Prelim. Inj. Hr'g Tr. 45:8-14 (Mar.

30, 2016), ECF No. 62.  In its prior requests for preliminary relief, Q Integrated outlined the significant costs associated with the "start-up" and "ramp-up" phases detailed in the solicitation. Supplemental Mem. in Support of Pl.'s Appl. for a TRO and Prelim. Inj. ("TRO Mem.") at 4-6, ECF No. 23; *see also* AR 2-580 to -84 (describing these transition phases).  Q Integrated also argued that there is significant potential for cost and disruption associated with the transition of the labor force from one offeror to another, because the offerors would want to employ much of the same key personnel in the contested areas.  TRO Mem. at 1-3.  Sage has already undertaken this process, and at this late stage there would be considerable harm to HUD and Sage if the court were to immediately enjoin the awards to Sage and direct the government to either reevaluate the proposals or conduct a new solicitation for these services.  Because the court has the ability to tailor equitable relief to address these potential hardships, *Geo-Seis*, 77 Fed. Cl. at 649-50, it has concluded that the awards to Sage should only be enjoined beyond the exercise of the first one-year option period, or in other words, beyond May 31, 2017.  In light of this grant of limited injunctive relief, Q Integrated is entitled to recover its reasonable costs incurred in bid preparation and proposal.  *See Geo-Seis*, 77 Fed. Cl. at 650 (holding that the court has discretion in appropriate circumstances to award both equitable and monetary relief limited to bid preparation and proposal costs, there where considerations of national defense circumscribed the scope of an injunction); *see also Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768, 792 (2009) (same, citing *PGBA*, 389 F.3d at 1226); *Klinge Corp. v. United States*, 87 Fed. Cl. 473, 480 (2009) (same, except the limitation on injunctive relief was attributable to the procuring agency's post-award actions) *CNA Corp. v. United States*, 83 Fed. Cl. 10-11 (2008) (same, where the limitation on injunctive relief stemmed from multiple solicitations), *aff'd*, 332 Fed. Appx. 638 (Fed. Cir. 2009).

## CONCLUSION

For the reasons stated, Q Integrated's motion for judgment on the administrative record is GRANTED IN PART and DENIED IN PART.  The government's and Sage's cross-motions for judgment on the administrative record are GRANTED IN PART and DENIED IN PART. HUD's awards of the Asset Management contracts to Sage for Areas 7A, 1D, and 5P are undisturbed for the base period and the first option year, but they are set aside and enjoined beyond the end of the first option period on May 31, 2017.  To secure asset management services for these three areas beyond this date, HUD must either (1) allow Q Integrated to revise its final proposal and then HUD must conduct a new evaluation for the contested areas, or (2) conduct a new solicitation for the pertinent services.  The clerk is directed to issue judgment in accord with this disposition.  There being no just reason for delay, final judgment in this regard shall be entered under RCFC 54(b).

In addition, Q Integrated is awarded its reasonable costs incurred in bid preparation and proposal.  Q Integrated shall submit its reckoning of such costs on or before May 18, 2016.  The government shall respond to Q Integrated's submission on or before May 31, 2016.[20]

---

[20]As noted earlier, Q Integrated's motion to amend its complaint to add challenges to Areas 8A, 1P, 3P, and 4P is DENIED.  *See supra*, at 17 n.17.

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge